No. 12-56638

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JANE DOE NO. 14,

*Plaintiff-Appellant*,

*v.*

INTERNET BRANDS, INC.,
D/B/A MODELMAYHEM.COM,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:12-cv-03626-JFW-PJW (Hon. John F. Walter)

**BRIEF FOR AMICI CURIAE THE COMPUTER AND COMMUNICATIONS INDUSTRY ASSOCIATION; THE INTERNET ASSOCIATION; CARE.COM, INC.; CRAIGSLIST, INC.; FACEBOOK, INC.; IAC/INTERACTIVECORP; AND TUMBLR, INC. IN SUPPORT OF DEFENDANT-APPELLEE'S PETITION FOR REHEARING AND REHEARING EN BANC**

FELICIA H. ELLSWORTH
BROOK HOPKINS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
617-526-6000

PATRICK J. CAROME
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
202-663-6000

November 10, 2014

## CORPORATE DISCLOSURE STATEMENT

The Computer and Communications Industry Association is not a publicly held corporation and does not have a parent corporation. No publicly traded corporation owns ten percent or more of its stock.

The Internet Association is not a publicly held corporation and does not have a parent corporation. No publicly traded corporation owns ten percent or more of its stock.

Care.com, Inc. is a publicly held corporation and does not have a parent corporation. No publicly traded corporation owns ten percent or more of its stock.

craigslist, Inc. is not a publicly held corporation and does not have a parent corporation. eBay Inc., a publicly traded corporation, owns approximately 28% of its stock.

Facebook, Inc. is a publicly held corporation and does not have a parent corporation. No publicly traded corporation owns ten percent or more of its stock.

IAC/InterActiveCorp is a publicly held corporation and does not have a parent corporation. No publicly traded corporation owns ten percent or more of its stock.

Tumblr, Inc. is not a publicly held corporation. Its parent corporation, Yahoo! Inc., owns 100% of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF AMICI CURIAE ....................................................1

SUMMARY OF ARGUMENT ...............................................................4

ARGUMENT ..................................................................................6

I. THE PANEL ADOPTED AN IMPERMISSIBLY NARROW INTERPRETATION OF SECTION 230 ...................................................6

    A. Doe's Claim Seeks To Hold Internet Brands Liable As The "Publisher Or Speaker" Of Content Created By Users Of Its Website.........................................................................6

    B. Section 230 Does Not Require The Exchange Of Third-Party Information To Occur *Solely* Through The Defendant's Website ...........................................................9

    C. The Panel's Narrow Interpretation Conflicts With Precedents From This Circuit And Other Courts................................10

II. THE PANEL OPINION WOULD HAVE FAR-REACHING NEGATIVE EFFECTS ON AMICI AND OTHER PROVIDERS OF INTERACTIVE COMPUTER SERVICES ....................................................................12

CONCLUSION ................................................................................19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) .........................................6, 7

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ..............................................15

*Beckman v. Match.com*, 2013 WL 2355512 (D. Nev. May 29, 2013) .....................8

*Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980
    (10th Cir. 2000) ..............................................................11

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ................10, 12

*Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H.
    2008) ..............................................................................9

*Doe v. MySpace Inc.*, 528 F.3d 413 (5th Cir. 2008) .....................................7, 10, 13

*Doe II v. MySpace, Inc.*, 96 Cal. Rptr. 3d 148 (Ct. App. 2009) ................................8

*Fair Housing Council of San Fernando Valley v. Roommates.com,
    LLC*, 521 F.3d 1157 (9th Cir. 2008).................................6, 8, 14, 17

*Green v. America Online, Inc.*, 318 F.3d 465 (3d Cir. 2003).............................8, 13

*Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010) ......................................................11

*Universal Communications Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413
    (1st Cir. 2007)..............................................................................10

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) .........11, 12, 14, 17, 19

## STATUTES, RULES, AND REGULATIONS

28 U.S.C. § 4102(c)(1).............................................................................11

47 U.S.C.
    § 230 ....................................................................................*passim*
    § 941 ....................................................................................11

## LEGISLATIVE MATERIALS

H.R. Rep. No. 107-449 (2002)..............................................................................11

iii

## OTHER AUTHORITIES

Alvarez, Lizette, *Girl's Suicide Points to Rise in Apps Used by Cyberbullies*, N.Y. Times, Sept. 13, 2013 ...................................................16

Firger, Jessica, et al., *Protestors Clash With Police*, Wall St. J., Nov. 18, 2011 .............................................................................................15

http://internetassociation.org/our-members/ ...............................................1

https://www.ccianet.org/members/ ...........................................................1

Izadi, Elahe, *Ice bucket challenge participants keep getting hurt*, Wash. Post, Aug. 28, 2014 .............................................................16

McCoy, Terrence, *How 'Ice Bucket' became a fundraising juggernaut*, Wash. Post, Aug. 18, 2014 .........................................16

Meyer, Erin, *Sexual predators turn to Web to snare victims*, Chi. Trib., Nov. 22, 2012 .................................................................................16

The University of North Carolina at Chapel Hill, *Sociologist Tracks Social Media's Role in Occupy Wall Street Movement*, http://sociology.unc.edu/features/sociologist-tracks-social-media2019s-role-in-occupy-wall-street-movement (last visited Nov. 10, 2014) ......................................................................................15

iv

## STATEMENT OF AMICI CURIAE[1]

The Computer and Communications Industry Association ("CCIA"); The Internet Association; Care.com, Inc.; craigslist, Inc.; Facebook, Inc.; IAC/InterActiveCorp ("IAC"); and Tumblr, Inc. submit this amicus brief to urge the Court to grant Internet Brands' petition for rehearing and rehearing en banc.

CCIA represents over twenty companies of all sizes providing high technology products and services, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services— companies that collectively generate more than $465 billion in annual revenues.[2]

The Internet Association represents the interests of leading Internet companies and their customers.[3] It seeks to protect Internet freedom, promote innovation and economic growth, and empower customers and users.

Care.com provides a web-based service that enables families to search for, qualify, vet, connect with, and select caregivers, and enables potential caregivers to create and post personal profiles describing their unique skills and experience.

---

[1] No counsel for a party authored this brief in whole or in part. No party, no party's counsel, and no person other than amici, their members, or their counsel made a monetary contribution to the preparation or submission of this brief.

[2] A list of CCIA members is available at https://www.ccianet.org/members/.

[3] A list of Internet Association members is available at http://internet association.org/our-members/.

craigslist provides local online classifieds, where users find the basic essentials of life, including employment, housing, transportation, goods, services, companionship, and community. craigslist receives over 100 million classified ads each month and more than two billion page views per day.

Facebook provides a free Internet-based social media service that enables more than 1.3 billion people to connect with their friends and family, to discover what is going on in the world around them, and to share what matters to them and to the people they care about.

IAC is a diversified online media company whose businesses are leaders in numerous sectors of the Internet economy. Many of these businesses, including Match.com, OkCupid, Ask.com, The Daily Beast, and Vimeo, provide users with the ability to post, search for, and view a wide variety of user-generated content.

Tumblr is a microblogging platform and social media website that allows users to share their artwork, writing, audio, video, and photography with the worldwide audience that they deserve.

Amici and their members have a substantial interest in the legal rules governing whether providers of interactive computer services may be subjected to lawsuits for alleged harms resulting from online exchanges of information. Because they serve as platforms for communication among billions of users, amici have been, and inevitably will continue to be, parties to lawsuits in which they

2

invoke immunity under Section 230 of the Communications Decency Act, 47

U.S.C. § 230(c)(1).  The success of these online businesses—and the vitality of

online media and online free speech generally—depends on their being shielded

from the risks, burdens, and uncertainty of lawsuits that would hold them liable for

hosting or facilitating online exchanges of third-party information that may result

in harm.

Amici rely on the settled interpretation of 47 U.S.C. § 230(c)(1) granting

broad immunity to online intermediaries for harms arising from third-party content.

The robustness of this immunity has been recognized by courts across the country,

but the panel's opinion threatens to undermine this settled interpretation.  If

allowed to stand, the opinion would contravene Congress's policy choices and

introduce substantial uncertainty to a law that has been crucial to the growth and

success of the Internet industry, and has become a prerequisite for the provision of

services upon which the public has come to rely.

## SUMMARY OF ARGUMENT

Amici urge reconsideration of the panel's opinion interpreting the scope of immunity under Section 230.  This case is a paradigmatic example of the well-worn maxim that "hard cases make bad law."  The factual underpinning of plaintiff's complaint is deeply disturbing.  Amici condemn the violent acts perpetrated against her and applaud the criminal justice system for putting the perpetrators behind bars.  But the contemptibility of those acts does not justify an end-run around Section 230.

Section 230 grants interactive computer service providers—like amici—immunity against claims for alleged injuries resulting from transmission, through the Internet or any other online service, of content created by third parties.  Courts in this Circuit and elsewhere have held, with near unanimity, that such claims are preempted by Section 230 because they impermissibly treat the service provider as the "publisher" or "speaker" of third-party content.

The panel held that plaintiff's negligent failure-to-warn claim was different from claims that courts routinely have held to be barred by Section 230.  But it is clear that plaintiff's claim seeks to hold Internet Brands liable for harms that she alleges resulted from the publication of her profile through its website to users who included her assailant(s), and/or from her assailants' fraudulent communications in response to that posting.  Because Internet Brands played no role in the alleged

4

scenario that led to Doe's injury other than providing an interactive service that disseminated or facilitated these third-party communications, her claim necessarily treats Internet Brands as the "publisher or speaker" of those communications and therefore is barred by Section 230.

The panel's misapplication of Section 230, if not vacated, would chill the creation, growth, and development of innovative and robust online services, such as those provided by amici, directly frustrating Congress's core purposes in enacting the statute. The panel's reasoning could allow suits against online service providers in a wide range of circumstances in which they merely intermediated third-party content that somehow resulted in harm to a user. The specter of such tort litigation and liability would undermine the very growth and development that Congress enacted Section 230 to promote. It also would discourage companies from responsible self-policing, even though elimination of exactly such disincentives was another of the statute's core purposes. In sum, the panel's decision frustrates Congress's express statutory intent, contradicts settled precedent, and should be reconsidered.

# ARGUMENT

## I. THE PANEL ADOPTED AN IMPERMISSIBLY NARROW INTERPRETATION OF SECTION 230

### A. Doe's Claim Seeks To Hold Internet Brands Liable As The "Publisher Or Speaker" Of Content Created By Users Of Its Website

Section 230 of the Communications Decency Act "immunizes providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) (footnote omitted). It bars claims that treat a service provider as "the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). In other words, Section 230 "protects from liability (1) a provider … of an interactive computer service (2) whom a plaintiff seeks to treat … as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-1101 (9th Cir. 2009).

Section 230 plainly bars Doe's claim, which seeks to hold Internet Brands responsible for injuries that allegedly resulted from dissemination of her self-authored profile through ModelMayhem.com to other users of the website, including her assailants, and from her assailants' self-authored fraudulent communications back to her. As Internet Brands explains more fully in its Petition (at 9-12), this failure-to-warn claim posits that Internet Brands owed a duty to warn

Doe of any known risks that arose out of their alleged "special relationship." The only "relationship" that the parties had, however, was the interactive service that Internet Brands provided, which enabled Doe to disseminate her profile information to ModelMayhem.com's large base of users, and which the assailants in turn used to obtain enough information about Doe to be able to create and transmit back to her fraudulent messages to persuade her to meet them. Thus, Doe's claim inherently depends on treating Internet Brands as a publisher or speaker of third-party content—her profile and/or the assailants' fraudulent messages. As such, Section 230 bars her claim.

The panel's incorrect holding that Internet Brands is not entitled to immunity appears to be based on Doe's framing of the complaint. But this Court and other courts have consistently held that Section 230 cannot be circumvented by artful pleading and that application of the statute requires examination of a claim's essential nature rather than its superficial label. *See, e.g.*, *Barnes*, 570 F.3d at 1101-1102 ("[W]hat matters is not the name of the cause of action … what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another."); *Doe v. MySpace Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (claim for failure to implement security measures that would have prevented an injurious exchange between website users was "merely another way of claiming that [defendant] was liable for publishing the

7

communications" at issue); *Green v. America Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003) (examining whether the "fundamental tort claim" at issue sought liability for "actions quintessentially related to a publisher's role"); *Doe II v. MySpace, Inc.*, 96 Cal. Rptr. 3d 148, 156 (Ct. App. 2009) (Section 230 applies notwithstanding plaintiffs' "characteriz[ation] [of] their complaint as one for failure to adopt reasonable safety measures," because "[a]t its core" plaintiffs seek to regulate third-party content); *see also Roommates.com*, 521 F.3d at 1174 ("[T]here will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality. Such close cases, we believe, must be resolved in favor of immunity[.]").

Doe's claim for negligent failure to warn suffers the same shortcomings as the claims in these prior cases. Regardless of its label, its essential nature is to impose tort liability for harms that allegedly resulted from the transmission of third-party content (Doe's profile and the assailants' responses) that was exchanged between users of defendant's website (Doe and her assailants). This is the paradigm of a claim that impermissibly treats a service provider "as the publisher or speaker of information provided by another content provider." *See Beckman v. Match.com*, 2013 WL 2355512, at *5 (D. Nev. May 29, 2013) (Section 230 bars negligent failure-to-warn claims), *appeal pending*, No. 13-16324 (9th Cir.).

**B.** **Section 230 Does Not Require The Exchange Of Third-Party Information To Occur *Solely* Through The Defendant's Website**

The panel apparently assumed that, for Section 230 to protect Internet Brands, the assailants' fraudulent response to Doe's profile needed to flow through a computer system operated by Internet Brands. Op. 11 ("there is no allegation that Model Mayhem transmitted any potentially harmful messages between Jane Doe and [her assailants]"). Setting aside the fact that Doe's complaint alleges that the assailants' response *did* occur "through" Internet Brand's website (Pet. for Reh'g 7-8),[4] this assumption was wrong as a matter of law.

Nothing in Section 230 requires that an interactive computer service provided by the party claiming immunity be the *only* service (or even one of the services) through which the third-party communications were exchanged. Rather, Section 230's definition of "information content provider," 47 U.S.C. § 230(f)(3), establishes that the statute's protection applies so long as the content that resulted in harm was "provided through the *Internet or any other* interactive computer service," *id.* (emphasis added). *See Doe v. Friendfinder Network, Inc.*,

---

[4] The Complaint's choice of the word "through" to describe the assailants' use of ModelMayhem.com to respond to Doe is telling, as that same word plays a key role in the statutory definition of "information content provider"—a definition that the assailants plainly satisfy, and that Internet Brands clearly does not, with respect to the fraudulent messages that lured Doe to harm. *See* 47 U.S.C. § 230(f)(3) ("any person or entity that is responsible, in whole or in part, for the creation or development of information provided ***through*** the Internet or any other interactive computer service" (emphasis added)).

9

540 F. Supp. 2d 288, 295-296 (D.N.H. 2008) (Section 230 extends to re-posting the offending information on websites other than that of defendant). Section 230(c)(1)'s equivalent protection of *both* "provider[s]" *and* "user[s]" of interactive computer services further underscores that that protection is not confined to circumstances in which the information resulting in harm flowed entirely (or even partly) through the defendant's own interactive computer service. As long as the plaintiff seeks to impose liability based on a claim that would hold an interactive service provider liable for its role in hosting or facilitating the publication of third-party content, as Doe does here, Section 230 applies.

### C. The Panel's Narrow Interpretation Conflicts With Precedents From This Circuit And Other Courts

The panel's crabbed reading of Section 230 led it to deny immunity to Internet Brands. But courts in this Circuit and elsewhere have recognized that Congress intended the statute to provide broad protection for online intermediaries, and the panel's narrow construction of Section 230 cannot be squared with either the reasoning or the result in these other courts. *See, e.g.*, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (Section 230 immunity is "quite robust"); *MySpace*, 528 F.3d at 418 ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content."); *Universal Commc'ns Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) ("[W]e too find that Section 230 immunity should be

10

broadly construed."); *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) ("The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." (internal quotation marks omitted)); *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 984-985 (10th Cir. 2000) (Section 230 "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third-party"); *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.").

On two occasions, Congress itself ratified this substantial body of case law by passing legislation extending the protections of Section 230 into new areas. *See* 47 U.S.C. § 941 (extending Section 230 protections to new class of entities); 28 U.S.C. § 4102(c)(1) (barring enforcement of foreign judgments inconsistent with Section 230); H.R. Rep. No. 107-449, at 13 (2002) (observing that courts "have correctly interpreted section 230(c)"). The panel's decision is at odds with this consensus interpretation.

## II. THE PANEL OPINION WOULD HAVE FAR-REACHING NEGATIVE EFFECTS ON AMICI AND OTHER PROVIDERS OF INTERACTIVE COMPUTER SERVICES

The panel's decision is not only incorrect, but also threatens to impede the growth and innovation of the Internet industry, in contravention of Congress's explicit purposes in enacting Section 230. Section 230's preamble declares that "interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," and have "flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. § 230(a)(3)-(4).

In order to preserve the robust nature of online media, Congress "'made a policy choice … not to deter harmful online speech through … imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.'" *Carafano*, 339 F.3d at 1123 (quoting *Zeran*, 129 F.3d at 330-331). Instead, Congress determined that only the actual creators of online content that causes harm should be held liable. Indeed, appropriately, Doe's assailants are serving life sentences for their crimes.

Industry experience confirms the wisdom of this policy. Section 230's grant of immunity from liability has allowed services like those offered by amici to flourish, providing consumers with innovative ways to connect and interact. But the panel's decision would undercut those great strides, and chill future innovation, by contravening almost uniform precedent and weakening the protection that

Congress provided. Its effects would reach far beyond the troubling facts of this case and impact a range of services that the panel never considered. In short, the panel's decision would have precisely the effects that Congress sought to avoid in enacting Section 230—hampering the development of forums for online communication and deterring responsible self-regulation.

The panel opinion could open the door to negligent failure-to-warn claims that would seek to impose liability on service providers in situations that courts have previously held to be within the scope of Section 230's protection. Indeed, many claims previously held to be barred by Section 230 could be refashioned as failure-to-warn claims and, under the panel's reasoning, subject providers to burdensome litigation and possible liability. For example, rather than basing her negligence claim on the "failure to implement basic safety measures to protect minors," the plaintiff in *MySpace*, 528 F.3d at 419, could just as easily have alleged that MySpace had failed to warn its users that they could be sexually assaulted by third parties whom they met through the site. And in *Green*, 318 F.3d at 469, rather than basing his claim on AOL's alleged "failure to police its services," the plaintiff easily could have reclothed his claim in "failure-to-warn" garb by alleging AOL had not adequately warned him of the risk of malware attacks from others using AOL's service.

Inviting plaintiffs to recast claims they otherwise would lose under Section 230 through such sleight-of-hand would be particularly troubling because liability premised on a failure to warn users of *known* risks would perversely discourage service providers from making efforts to learn about and protect their users from nefarious ways in which third parties may be abusing their services. *See* Op. 10 (failure-to-warn liability "based on [Internet Brands'] knowledge of the rape scheme"). Section 230(c)(1) intentionally *removed* knowledge from the immunity analysis to eliminate incentives for online intermediaries to refrain from monitoring their services for abuses, and to give responsible intermediaries breathing room to take innovative steps to detect and deter misconduct that could harm other users or the public. *See Roommates.com*, 521 F.3d at 1163 (Section 230 was enacted to correct prior precedent that encouraged interactive computer services to "bury their heads in the sand and ignore problematic posts altogether [to] escape liability"); *Zeran*, 129 F.3d at 331 ("Congress enacted § 230 to remove disincentives to self-regulation."). The panel decision would have the opposite effect, discouraging companies from policing harmful third-party activity because doing so may create knowledge of a particular risk that could be used against the company in litigation.

The panel's decision also could have far-reaching and untoward effects on many beneficial uses of interactive computer services. Under the panel's reasoning, any online intermediary that enables users to exchange information that may lead to

14

real-world interactions (such as posting contact information, or proposing a physical meeting place) could be subject to suit for failing to warn of the myriad risks that such interactions might carry. The specter of such litigation and liability could result in online intermediaries curtailing services that are designed to facilitate beneficial, real-world interactions. *See Batzel v. Smith*, 333 F.3d 1018, 1027-1028 (9th Cir. 2003) ("Making interactive computer services … liable for the speech of third parties would severely restrict the information available on the Internet.").

For example, the Occupy Wall Street political movement was largely organized through online communication among third parties that was intermediated through social media platforms, including some provided by amici. *See* The University of North Carolina at Chapel Hill, *Sociologist Tracks Social Media's Role in Occupy Wall Street Movement*, http://sociology.unc.edu/features/ sociologist-tracks-social-media2019s-role-in-occupy-wall-street-movement (last visited Nov. 10, 2014) ("'Social media sites such as Facebook and Twitter have been central organizing locations for spreading information about Occupy Wall Street.'"). Those online communications prompted or expanded real-world demonstrations, at which some protesters sustained serious injuries. *See, e.g.*, Firger et al., *Protestors Clash With Police*, Wall St. J., Nov. 18, 2011 (protests resulted in "scores of arrests and more than a dozen injuries"). Under the panel's reasoning, Section 230 potentially would not protect these social media platforms

15

from lawsuits arguing that they owed a duty to warn their users, and therefore would allow liability for injuries that resulted from attending the demonstrations.

Similarly, the panel's reasoning could expose online intermediaries to lawsuits seeking recovery for harms flowing from one of the most successful social-media-driven fundraising campaigns in history—the "ice bucket challenge." There, users of social media challenged their friends to donate $100 to the ALS Association, which raises money to fight amyotrophic lateral sclerosis. McCoy, *How 'Ice Bucket' became a fundraising juggernaut*, Wash. Post, Aug. 18, 2014. The campaign was hugely successful, but some participants were injured. Izadi, *Ice bucket challenge participants keep getting hurt*, Wash. Post, Aug. 28, 2014. Once again, the panel's reasoning would make Section 230 unavailable in lawsuits against providers of social media platforms through which users issued the challenge on the theory that they had a duty to warn their users about the potential risk of injury.

Additional examples are abundant. Victims of sexual assault who met their assailant through a dating website could seek damages from the website operator for failing to warn of the known risk of sexual predation through such sites. *See* Meyer, *Sexual predators turn to Web to snare victims*, Chi. Trib., Nov. 22, 2012. Teens who are bullied as a result of content posted on social media could sue those platforms for their failure to warn of the known risk of such abuse of their services. *See* Alvarez, *Girl's Suicide Points to Rise in Apps Used by Cyberbullies*, N.Y.

16

Times, Sept. 13, 2013 (teen was "driven to suicide … mostly through a new collection of texting and photo-sharing cellphone applications").  A person who purchased a bicycle through an online classifieds site and was later hit by a car and critically injured could sue that website for failing to warn of the dangers inherent in riding a bicycle.  Indeed, the panel's reasoning encompasses any situation in which a known, real-world harm stems in some way from online communications.  Although many online service providers go to great lengths to ensure safe use of their services, they cannot prevent every potential harm that could befall a user.  If the panel's decision were left standing, it could require online intermediaries to litigate a staggering number of fact-intensive lawsuits without the benefit of Section 230 immunity.  In each case, service providers would be forced to litigate the existence of the alleged "special relationship," whether the risk was "known," and the extent of the warning required.

Despite the far-reaching implications of its decision, the panel declined to consider the many potential untoward effects of its ruling.  Op. 11.  In so doing, it overlooked a principal objective of Section 230 immunity.  As Chief Judge Kozinski emphasized in *Roommates.com*, the statute was designed "to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles."  *Roommates.com*, 521 F.3d at 1175; *see also Zeran*, 129 F.3d at 330 (Section 230 was designed to promote "freedom of speech in the new

and burgeoning Internet medium" by eliminating the "threat [of] tort-based lawsuits"). The prospect of litigating the merits of a litany of tort claims—even weak ones—would place a substantial burden on existing Internet services and deter the development of new ones, in direct contravention of Congress's intent.

The sheer volume of third-party content intermediated by companies like amici illustrates the burdens that such companies would face if the panel decision were allowed to stand. For example:

- Care.com has over 11 million members and helps employers and caregivers connect virtually for real-world employment.

- craigslist hosts 100 million classifieds each month, and users meet billions of times annually, as buyers and sellers, employers and job seekers, first dates, activity partners, roommates, tenants, landlords, and more.

- People on Facebook on average share more than 4.75 billion content items every day.

- IAC publishes a number of dating websites, including OkCupid, Match.com, Tinder, and SpeedDate.com. IAC's websites together receive more than a billion monthly visits. Its popular dating service, Match.com, receives 93 million visits alone every month.

- Tumblr hosts over 207 million blogs and nearly 100 billion posts. There have been over 41,000 real-world "meetups" among its users.

These services, and others like them, have revolutionized how people buy and sell goods, locate services, find employment, search for housing, make real-world connections, learn facts, share opinions, and otherwise interact. Section 230 plays a critical role in keeping these services viable. If service providers were

18

forced to issue a warning for every "known" risk of harm related to online information, users would be overwhelmed with a flood of warnings, making any particular warning unlikely to be noticed and degrading the overall utility of the service. Moreover, given the "staggering" volume of content that they carry, if service providers were "[f]aced with potential liability" for their role in hosting or facilitating the flow of third-party content that results in harm, they might be forced to change their content policies to limit what information can be shared on their services, or take even more significant defensive steps. *See Zeran*, 129 F.3d at 331. Section 230 is intended to prevent this very outcome.

## CONCLUSION

For the foregoing reasons, the panel's decision should be reconsidered.

Respectfully submitted,

/s/ Patrick J. Carome

FELICIA H. ELLSWORTH
BROOK HOPKINS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
617-526-6000

PATRICK J. CAROME
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
202-663-6000

November 10, 2014

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure (FRAP) 32(a)(7)(C), I certify that this brief complies with the type-volume limitation of Circuit Rule 29-2(c)(2).

1. Exclusive of the exempted portions of the brief, as provided in FRAP 32(a)(7)(B), the brief contains 4,179 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by FRAP 32(a)(7), I have relied upon the word count feature of this word processing system in preparing this certificate.

/s/  Patrick J. Carome
PATRICK J. CAROME

November 10, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of November, 2014, I electronically filed the foregoing with the Clerk using the appellate CM/ECF system. Counsel for all parties to the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Patrick J. Carome

PATRICK J. CAROME